**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard Joseph FINLEY, Defendant–
Appellant.**

No. 01–10087.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 2001.

Filed Aug. 20, 2002.

J. Toney, Woodland, CA, for the appellant.

John K. Vincent, United States Attorney, Norman Wong, Assistant United States Attorney, Thomas E. Flynn, Assistant United States Attorney, and Mark J. McKeon, Assistant United States Attorney, Sacramento, CA, for the appellee.

Before: BRIGHT,* B. FLETCHER, and FISHER, Circuit Judges.

BRIGHT, Circuit Judge.

On July 9, 1999, the government filed a second superceding indictment against Richard Joseph Finley charging him with one count of making a false claim against the United States in violation of 18 U.S.C. § 287, one count of attempting to interfere with the administration of the Internal Revenue Service in violation of 26 U.S.C. § 7212(a), and three counts of bank fraud in violation of 18 U.S.C. § 1344.

A jury trial began on December 21, 1999. In the middle of the defendant's presentation of his expert psychological witness, the government objected to the witness' testimony and requested that the testimony be struck as a sanction for the defendant's violation of Federal Rule of Criminal Procedure 16(b)(1)(C). After lengthy discussions outside the presence of the jury and after the district court conducted a hearing pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the district court excluded the entirety of defense expert's testimony as a sanction for violation of Rule 16 and as unreliable and irrelevant under Federal Rule of Evidence 702.

On January 5, 2000, the jury returned guilty verdicts on all but one bank fraud count. The court dismissed the one remaining bank fraud count based upon the jury's inability to reach a verdict.

Finley appeals his conviction and forty-eight-month sentence of imprisonment. Finley raises the sole issue of whether the trial court abused its discretion by excluding the entirety of his psychological expert's testimony.

We REVERSE and REMAND on this record determining that the trial court erred in striking all expert testimony presented by Finley that corroborated his defense.

## I. BACKGROUND

### A. Facts

Finley owned a law bookstore and ran a bar review course for students of non-accredited law schools. In 1992, Finley began looking for investors to assist him in opening a chain of approximately twenty bookstores across the United States. Finley could not obtain traditional bank financing because of a dispute he had with the IRS over a large tax claim.

In November 1995, a customer mentioned that he had attended an investment seminar in Montana run by Leroy Schweitzer.[1] Inspired by this suggestion, on December 22, 1995, Finley went to Schweitzer's farmhouse in rural Montana to attend the so-called investment seminar. Schweitzer explained that he possessed re-

---

* The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. Schweitzer led a group of people calling themselves the "Montana Freemen." Among other things, Schweitzer gave seminars on his version of the "common law." At the conclusion of these seminars, Schweitzer gave participants, such as Finley, fraudulent monetary instruments. The United States has prosecuted and convicted Schweitzer of various crimes.

corded liens against Norwest Bank of Montana, other banks, and individuals, and that he could draw on these accounts by issuing negotiable instruments.

At the conclusion of the seminar, each attendee received a five-minute audience with Schweitzer to explain the attendee's needs. When he met with Schweitzer, Finley explained his business plan to open a chain of bookstores. Finley also told Schweitzer that he owed the IRS about $180,000 and that he owed a mortgage on his condominium with Great Western Bank.

Schweitzer gave Finley several documents that looked like financial instruments and were entitled, "Comptroller's Warrants" and "Certified Banker's Checks." Schweitzer made one document payable to Finley and the Bank of America for $6,125,000, Finley's estimate of the cost of starting his bookstore chain. Schweitzer made the second document out to Finley and Great Western Bank for $150,000, or about twice the remaining amount Finley owed on his mortgage. The third instrument named the IRS and Finley as payees for $360,000, twice the amount Finley owed in taxes. Although nothing existed in writing, Finley understood that Schweitzer would receive thirty-five percent of the profits from the bookstores.

Finley returned to Sacramento, California with the documents and prepared to open his new bookstores. He attempted to deposit the $6 million document with the Bank of America in late December 1995 and again in August 1996. Finley gave the Bank of America document to an officer who had handled Finley's business accounts for several years. The bank began

processing the instrument, but it was returned marked "fictitious check" with a separate notice that indicated "please resubmit when corrections are made." (Appellant's Br. 6) The bank also contacted the post office and received a "fraud alert" addressing similar instruments from Schweitzer. The bank gave a copy of the alert to Finley. Nonetheless, Finley attempted to negotiate the instrument a second time in August 1996. This time Finley told the bank to send it to a designated address, but the item came back unpaid again.

Similarly, on January 2, 1996, Finley attempted to use the $152,000 document to pay off his real estate mortgage with Great Western Bank. Finley included a note indicating the failure to refund the excess amount would constitute criminal conversion. Great Western did not negotiate the instrument because the bank had prior knowledge of fraud alerts regarding Schweitzer's instruments.[2]

On January 5, 1996, the chief of the fraud section of the Office of the Comptroller of the Currency wrote Finley stating that the Schweitzer document was "not a valid obligation of the federal government; the special account number is not an account for redemption of payment of such an instrument; the format is not one used by the federal government" and advised Finley to contact the FBI. (Appellant's Br. 8).

Undeterred by this information, Finley mailed the $360,000 document to the IRS Center in Ogden, Utah on January 17, 1996. Finley included a letter requesting "immediate refund for overpayment" in the amount of $180,000. The IRS did

**2.** Numerous alerts existed regarding the Schweitzer instruments including: (1) a Postal Bulletin Fraud Alert dated December 7, 1995; (2) an Office of the Comptroller of the Currency (OCC) fraud alert dated September 8, 1995; (3) an OCC fraud alert dated Novem- ber 20, 1995; (4) a California State Banking Department weekly bulletin dated November 11, 1995, addressing Schweitzer's instruments; and (5) an OCC fraud alert dated February 8, 1996.

not credit the amount to Finley's balance because of its prior knowledge of Schweitzer's instruments. The IRS had received more than two hundred requests for refunds totaling $64,000,000 and IRS workers knew that no refunds should be issued.[3] Finley submitted the IRS document on a total of three separate occasions.

After determining that the IRS and the banks would not honor his documents, Finley embarked on an eight-month quest to learn why the government agencies would not honor what he believed to be valid financial instruments. Finley contacted in person or via mail, facsimile, or telephone several state and federal agencies in an attempt to learn how to negotiate the instruments. Every response indicated that the instruments were the subject of a fraud alert, deemed without value, and should not be honored.

In mid–1996, Finley prepared a "media packet" detailing his efforts to cash the instruments. He entitled the document "Robin Hood and the 9 Hoods" and portrayed various government officials as "bad guys" for not cashing the documents. (Appellant's Br. 9). He distributed this packet to numerous network news programs and national newspapers. No media responded to his packets.

In April 1996, the FBI arrested Schweitzer and others, but not Finley, on multiple charges of fraud based on Schweitzer's seminars and instruments. Around this time, Finley ceased his pursuit to have the instruments honored.

In June 1998, Finley testified at Schweitzer's trial in Montana. In his testimony he stated that the government had not prosecuted him for attempting to cash the instruments. This trial resulted in a hung jury. Prior to his testifying in the second trial of Schweitzer in October 1998, the government notified Finley that it would indict him. A grand jury formally indicted Finley on November 6, 1998.

## B. Trial Proceedings

On August 18, 1999, Finley's counsel filed a notice under Fed.R.Crim.P. 12.2(b), informing the government that it intended to introduce testimony "relating to a mental disease or defect or any other mental condition" relevant to guilt. The government made a discovery request for information about the expert testimony. In response, on October 1, 1999, Finley's attorney sent a letter to the government summarizing the expert opinions of Dr. John J. Wicks. Dr. Wicks, a licensed clinical psychologist in California, had examined Finley. This letter represented that Finley "has an atypical belief system, a system which is very rigid." The letter also stated, "While Mr. Finley presents some indications of Shared Psychotic Disorder (Folie a Deux), Dr. Wicks does not at present make that diagnosis. Mr. Finley is not suffering under any mental condition which is reported in the DSM–IV."[4]

---

3. The evidence indicated that certain persons who previously presented Schweitzer's instruments to the IRS had received about $17,000 in refunds.

4. The full letter reads as follows:

Yesterday I spoke with John Wicks, Ph.D. on the subject matter of his evaluation of Mr. Finley. Dr. Wicks will not be preparing a report at this time, but gave me the following oral statement of his opinions on Mr. Finley's present mental status. This oral statement is all that I have at this time and is all that I will have in writing of the evaluation at present.

Dr. Wicks made the following observations of Mr. Finley:

Mr. Finley is in acceptable physical condition, suffering from some physical ailments and some anxiety and minimal depression. He also has an atypical belief system, a system which is very rigid. Mr. Finley has some self destructive qualities and as a result it is hard to find an authority or source available which would satisfy him on the issue of the

In a second letter dated October 25, 1999, Finley's counsel once again represented their intent to call Dr. Wicks at trial. In pertinent part, that letter reads:

Mr. Finley's mental condition, as set forth by Dr. Wicks, will be presented at trial to show that Mr. Finley did not have the intent to defraud, the requisite mens rea for the crime. The case of *United States v. Rahm* [,] 993 F.2d 1405 (9th Cir.1993) contains a very similar fact pattern and is legal authority for the admission of the evidence. I have attached a copy of the opinion for your convenience.

Thereafter, the prosecution moved under Fed.R.Evid. 704,[5] to preclude Finley from relying on expert mental health testimony at the trial. At the hearing on the motion, neither party sought an examination of the psychologist to qualify that testimony under the *Daubert*[6]/*Kumho Tire*[7] requirements. The government's contention was that Fed.R.Evid. 704(b) barred the testimony because it addressed an honestly-held "value system."

The court ruled that Dr. Wicks' testimony would be admissible and expressed its understanding that Dr. Wicks could not testify about any element of the crime charged. The court then advised counsel:

Then I think the way to handle it is to be careful on examination and to make appropriate objections, Mr. McKeon [the prosecutor]. If a question is asked that you feel calls for Dr. Wicks to express an opinion about Mr. Finley's actual belief or the sincerity of those beliefs, you may object. And then if he blurts it out, move to strike, and I'll strike it.

Additionally, the court instructed Finley's counsel to meet with Dr. Wicks to "make it clear to him the areas that he's not supposed to go into ... [s]o he has to stay within the bounds of the Court's ruling on what's relevant."

The parties proceeded to trial and the defense called Dr. Wicks. Dr. Wicks explained his thirty years of experience in psychology including his extensive experience in conducting psychological evaluations of patients. He stated that he spent two days with Finley, including administering a battery of psychological tests and interviewing him. As a result of the tests and examination, Dr. Wicks testified that Finley has an atypical belief system. Dr. Wicks explained that most people have an open belief system which is subject to change, but some people have closed belief systems. Closed belief systems are more abnormal because they are fixed and rigid.

validity of the liens and warrants involved in this case. While Mr. Finley presents some indications of Shared Psychotic Disorder (Folie a Deux), Dr. Wicks does not at present make that diagnosis. Mr. Finley is not suffering under any mental condition which is reported in the DSM–IV.

Thank you again for your courtesy and cooperation, and please do not hesitate to contact me at anytime to discuss this case.

DSM–IV is entitled "The Diagnostic and Statistical Manual of Mental Disorders," 4th Ed., 1994 (American Psychiatric Association).

5. Federal Rule of Evidence 704 provides:

(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

6. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

7. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Dr. Wicks then testified how an atypical belief system operates. Dr. Wicks testified:

It's a closed belief system in which practical—or information from the real world that comes in is so grossly distorted that the person ends up with a belief system that the average person in the culture just simply would sit back and say, "Huh? How can you believe that?" If X, Y, and Z doesn't fit with that, they would then come up with an explanation how X, Y, and Z fit just fine with their belief system.

Dr. Wicks explained that a delusion is another psychological term for an atypical belief system and he stated there are three major categories of delusions. Dr. Wicks opined that Finley was vulnerable to a delusional disorder in December 1995, stating: "He tends to hear what he wants to hear and believe what he wants to believe about someone. So this had happened even prior to 1995." The doctor concluded that Mr. Finley suffered from a delusional disorder from a minimum of 1995 until the present. He elaborated that a person with a delusional disorder can be dissuaded from the delusion "[o]nly with tremendous, tremendous difficulty."

At this point, the government objected to Dr. Wicks' testimony and moved to strike it as a discovery violation. After extensive discussion with counsel for both parties, the court expressed the view that defense counsel had sandbagged the prosecutor and the court. Then the court decided to conduct a *Daubert* hearing that afternoon before proceeding with trial.

At that hearing, Dr. Wicks explained his methodology and stated the psychological community accepted the methodology he used. That methodology included a history of the patient, consisting of family, vocational, educational, medical and legal histories, the observation of the patient's behavior, and the administration of standard psychological tests. He stated he did not diagnose Finley as having a delusional disorder, although Finley's symptoms did fit within many of its criteria. He explained his fear that such a diagnosis might have suggested that Finley was legally incompetent, whereas Dr. Wicks believed Finley could assist counsel and understood his legal proceedings. This left Dr. Wicks with a diagnosis of an atypical belief system.

Dr. Wicks indicated that Finley's psychological tests were consistent with a diagnosis of a delusional disorder. Dr. Wicks explained that Finley's Million Clinical Multiaxial Inventory indicated that he had a high level of narcissism, a trait of a delusional person. The test also showed an elevated anxiety scale and a mild level of depression. Dr. Wicks explained how he used these tests to rule out other psychological disorders including schizophrenia, manic depression, and psychosis.

At the conclusion of the *Daubert* hearing, the district court ruled from the bench. The court excluded the testimony on two grounds. It indicated that either ground was sufficient to exclude the testimony. First, under Fed.R.Evid. 702 [8] the court ruled that "the testimony would not be helpful to the jury." The court indicated that the jury could independently deter-

---

8. At the time of the district court's ruling, the language of Federal Rule of Evidence 702 read:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We note that in the 2000 Amendments to the Federal Rules of Evidence, Rule 702 was amended in response to *Daubert*. Those changes do not affect our analysis in this case.

mine Finley's credibility. The second ground for excluding the evidence struck the testimony as a sanction for a Fed. R.Crim.P. 16(b)(1)(C) [9] violation.

## II. STANDARD OF REVIEW

■ We review for abuse of discretion a district court's decision to admit or exclude scientific evidence. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). A court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous view of the facts. *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir.1997) (en banc). Under the abuse of discretion standard, we reverse where we have "a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Benavidez–Benavidez*, 217 F.3d 720, 723 (9th Cir.2000). However, a trial court has "broad discretion" in assessing the relevance and reliability of expert testimony. *United States v. Murillo*, 255 F.3d 1169, 1178 (9th Cir.2001).

■ We review the interpretation of a discovery rule's meaning *de novo*. *See United States v. Peters*, 937 F.2d 1422, 1424 (9th Cir.1991). We review for abuse of discretion the propriety of excluding the evidence as a sanction when the rule has been violated. *Id.*

9. Federal Rule of Criminal Procedure 16(b)(1)(C) provides:
Under the following circumstances, the defendant shall, at the government's request, disclose to the government a written summary of testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial: (i) if the defendant requests disclosure under subdivision (a)(1)(E) of this rule and the government complies, or (ii) if the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.

## III. DISCUSSION

The district court excluded Dr. Wicks' testimony as inadmissable under Fed. R.Evid. 702 and as a sanction under Fed. R.Crim.P. 16(b)(1)(C). The court indicated that it believed either ground was sufficient to exclude the testimony. Therefore, we must evaluate the admissibility of the proffered evidence under both rules.[10] We will first consider the reliability and relevance of Dr. Wicks' expert testimony under Rules 702 and 704(b), then we will consider the trial court's exclusion of the testimony as a Rule 16 sanction.

### A. Exclusion of Dr. Wicks' Expert Testimony as Unreliable and Irrelevant

■ Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. The rule consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion. *Morales*, 108 F.3d at 1038.

■ Our Rule 702 analysis is guided by relevant Supreme Court precedent. *See Benavidez–Benavidez*, 217 F.3d at 724(explaining how the *Daubert* Court set out factors to be reviewed when applying Rule 702). In *Daubert*, the Supreme Court

This summary shall describe the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications.

10. In reaching its conclusions about the relevance and reliability of Dr. Wicks' testimony, the district court mentions only Rule 702 explicitly. Nonetheless, it is clear that considerations falling under Rule 704(b) are implicated as well. Rule 702 and Rule 704(b) are the two relevant federal rules which govern the admissibility of expert testimony. *Morales*, 108 F.3d at 1035.

charged trial judges with the responsibility of acting as gate-keepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The Court articulated a two-step inquiry for determining whether scientific evidence or testimony is admissible. First, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. The Court cautioned that the trial court must focus "on [the] principles and methodology, not on the conclusions that they generate." *Id.* at 595. Second, the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact. *Id.* at 592–93. Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Id.* at 591. The Court, in *Kumho Tire,* clarified that the district court's gatekeeper function applies to all expert testimony, not just testimony based in science. *See* 526 U.S. at 147.

The government does not contest that Dr. Wicks possesses the qualifications to testify as an expert under Rule 702. The district court acknowledged that Dr. Wicks qualifies as an expert in his field. The main issues of contention between the parties center on whether Dr. Wicks' methodology is reliable and whether his testimony will assist the jury. In resolving this issue we will rely on the pertinent Federal Rules of Evidence, *Daubert, Kumho Tire,* and this circuit's case law.

### 1. Reliability: Dr. Wicks' Methodology

At the conclusion of the *Daubert* hearing, the district court made several obser-

vations about Dr. Wicks' reasoning and methodology. Initially, it concluded:

> Dr. Wicks' methodology is itself nothing unusual. The methodology itself is the form that is used by medical doctors uniformly. He considers the history given by the patient, his observations clinically of the patient's behavior, and any psychological testing .... I have no doubt that his psychological tests are well established tests that are widely accepted in the medical and psychological community.

However after making these general observations, the court went on to identify what it considered to be several problems with the reliability of Dr. Wicks' opinion. The court seemed troubled by the fact that the psychological tests did not reveal a conclusive diagnosis. The court recognized that Dr. Wicks' diagnosis was not inconsistent with the psychological tests, but said, the results are "not inconsistent with a lot of other things." The court also asserted that Dr. Wicks based his opinion on his belief that Finley was not faking or being deceptive:

> When you strip his opinion down to what it really seems to be based on, Mr. McKeon is correct. It's based on the assumption that what he's saying in his history and what he tells to Dr. Wicks is true. It relies upon the assumption that he is being truthful when he says what his views are.[11]

In its brief, the government extrapolates from the district court's position and argues that Dr. Wicks' opinion is not reliable because it "depends entirely on the doctor's subjective assessment of Finley's truthfulness." (Appellee's Br. 12). The government also contends that Dr. Wicks' methodology is deficient under Rule 702

---

**11.** The court later complained, "there are no standards that we can put our fingers on for how you tell medically or scientifically whether somebody is telling the truth."

because he based his conclusions on facts that were merely "commonsensical"[12] or beyond the scope of his expertise.[13]

It appears from the record before us that Dr. Wicks based his diagnosis on proper psychological methodology and reasoning. He relied on accepted psychological tests, from which he drew sound inferences, and he took a thorough patient history, including meeting with Finley's wife and observing Finley's behavior. Dr. Wicks did not base his conclusions solely on Finley's statements; rather, he used his many years of experience and training to diagnose Finley's mental condition. Finally, Dr. Wicks did not use any experimental techniques in his evaluation of Finley and he did not deviate in any way from his normal practice of conducting psychological evaluations. Thus, we reject the government's argument.

The government argues Dr. Wicks' diagnosis is unreliable because it is based on the fact that Dr. Wicks believed that Finley was not deceiving him. The government cites several out-of-circuit cases that it alleges support the argument that Dr. Wicks' opinion is founded on accepting Finley's truthfulness rather than on sound psychological methodology. *See United States v. Charley*, 189 F.3d 1251 (10th Cir.1999); *United States v. Whitted*, 11 F.3d 782, 785 (8th Cir.1993); *United States v. Benson*, 941 F.2d 598, 604–05(7th Cir. 1991); and *Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir.1987). None of these cases is apposite.

Neither *Charley* nor *Whitted* supports the government's position because both cases involve a medical doctor's testimony about the truth of a child victim's report of sexual abuse. In both cases, the truth of the victim's report was the very substance of the doctor's testimony. The government acknowledges in its brief that Finley's truthfulness is not the substance of Dr. Wicks' opinion. (Appellee's Br. 13). The government instead contends that Dr. Wicks "founded" his opinion on Finley's truthfulness. Again, however, the facts of this case and the case law offered do not support the government's position.

In *Charley* and *Whitted*, medical doctors called as experts testified to their opinions that children were abused based primarily on the statements of the children that they were abused. *Charley*, 189 F.3d at 1267(describing opinions as based "largely" on witness statements); *Whitted*, 11 F.3d at 786 (describing opinions as based "solely" on witness statements). Thus, in each of those cases, the expert was merely reciting the allegation of the alleged victim "in the guise of a medical opinion," *Whitted*, 11 F.3d at 785–86, which "does nothing but vouch for the credibility of another witness . . ., and therefore does not 'assist the trier of fact' as required by Rule 702." *Charley*, 189 F.3d at 1267. In addition, each court noted that the fact of whether the alleged abuse occurred was for the jury to decide and therefore the expert's testimony was usurping the role of the jury as the ultimate fact finder. *See Charley*, 189 F.3d at 1270; *Whitted*, 11 F.3d at 787.

Unlike the experts in *Charley* and *Whitted*, Dr. Wicks did not merely recite Finley's statements to the jury in the guise of a medical opinion. Dr. Wicks did not base his diagnosis of Finley on Finley's own conclusion that he had a mental impairment the way the doctors in *Charley* and *Whitted* based their diagnosis of the exis-

---

**12.** These commonsensical matters include Dr. Wicks' observation of Finley's physical manifestations, such as facial flushing, hand trembling and stammering.

**13.** These matters include Finley's refusal to accept the plea bargain and the possibility of his diagnosis being misconstrued as supporting a finding of legal incompetency.

tence of abuse on the witnesses' statements that they were abused.

Nor did Dr. Wicks' diagnosis of Finley usurp the role of the jury with regard to an ultimate issue of fact. The jury needed to decide whether Finley knew the financial instruments were fake, not whether he had a mental impairment that might inhibit him from reaching the conclusion that the instruments were fake. The jury could accept Dr. Wicks' diagnosis and still find that Finley knew the instruments to be fraudulent. Neither *Whitted* nor *Charley* stands for the proposition the government would have it support: that a psychologist cannot provide expert testimony about his diagnosis of a mental disorder based on a variety of factors, including the statements made by the defendant to the psychologist in the course of his examination.

Likewise, *Benson*, 941 F.2d 598, and *Viterbo*, 826 F.2d 420, do not support the government's argument and are inapplicable to the facts of this case. In *Benson*, the Seventh Circuit found an abuse of discretion where the trial court allowed the government to introduce the testimony of an Internal Revenue Service agent whose purpose was to summarize the government's case and give his expert opinion on whether the defendant was required to file income tax returns. The court concluded that much of the agent's testimony consisted of "nothing more than drawing inferences from the evidence that he was no more qualified than the jury to draw" and the agent relied on testimony from other witnesses whose "credibility was vigorously attacked" by the defendant. 941 F.2d at 604. Specifically, the court noted that the agent had no "special skill or knowledge" that would allow him to credit the

truthfulness of the other witnesses. *Id.* As we have outlined, Dr. Wicks based his psychological analysis of Finley on more than a summary of Finley's statements, and he was eminently more qualified than a layperson on the jury to assess the significance of facts such as Finley's adamant refusal to accept, or even consider, the government's plea offer.[14]

*Viterbo* also is distinguishable from the present case. In *Viterbo*, the Fifth Circuit upheld the exclusion of the expert opinion of a medical doctor as lacking a reliable foundation because the doctor did not perform a proper medical history of the patient prior to developing his opinion. There, the medical expert sought to attribute the plaintiff's depression and other ailments to his exposure to a chemical based only on the plaintiff's statements that he experienced the symptoms and exposure to the chemical "was the only possible cause." 826 F.2d at 424. The Fifth Circuit upheld the exclusion of that testimony because the doctor "was not aware that Viterbo had a family history of depression and hypertension" that could have explained the source of the symptoms. *Id.* at 423(concluding that the failure to take into account this history "seriously weakens" the reliability of the patient's oral history as a foundation for the doctor's expert opinion). It is not clear that Dr. Wicks made a similar error in diagnosing Finley. The trial record reveals that Dr. Wicks' opinion is based on more than simply crediting Finley's statements. Dr. Wicks administered psychological tests to rule out serious mental disorders, he took a case history and interviewed Finley's spouse to ascertain additional information, and he observed Fin-

---

**14.** The government argues that Dr. Wicks was not qualified to assess the quality of a plea offer in a criminal case because he is not an attorney. While this may be true, Dr. Wicks can certainly assess the mode of reasoning that Finley employed to consider the plea offer and draw conclusions about Finley's apparent refusal to compromise or negotiate.

ley's physical movements and conducted a physical exam to determine if there was a possible physiological problem. The government has not argued that Dr. Wicks' opinion is based on an inaccurate history or is lacking in any specific facts.

We also reject the government's argument because Dr. Wicks provided articulable reasons why he believed Finley was not being deceptive or faking. At the *Daubert* hearing, Dr. Wicks explained that "there was no indication that he [Finley] was being deceitful on what probably amounted to four or five hours of testing." Dr. Wicks had previously explained how the psychological tests were specifically designed to detect someone who is trying to fake a mental illness. In addition, Dr. Wicks noted that Finley's responses were internally consistent, and Dr. Wicks had not identified any defensiveness in Finley or any indication that he was over-representing his symptoms. Based on his clinical experience and these facts, Dr. Wicks concluded that Finley was not faking or lying.[15]

A belief, supported by sound reasoning, that the patient is not faking or lying is sufficient to support the reliability of a mental health diagnosis. In a different factual context, we have stated that "the law does not require every expert who testifies to be an expert in detecting deceit." *United States v. Morales*, 108 F.3d 1031, 1039 (9th Cir.1997) (reversing a district court's exclusion of defendant's bookkeeping expert who the district court excluded because the defendant "may have intentionally deceived" the expert about her true knowledge of bookkeeping principles). Analogously, we refuse to require that mental health experts prove themselves infallible lie detectors before accepting their psychological diagnoses.

The government next seeks to convince us that Dr. Wicks' diagnosis is unreliable because he based his conclusions on matters beyond his expertise. The doctor was initially hesitant to apply the delusional disorder terminology of the DSM–IV based on his fear that using certain terms would cause the court to question Finley's legal competence.[16]

In testimony before the jury prior to the government's objection, Dr. Wicks explained that a closed belief system, which distorts or rejects information that does not comport with certain beliefs, is called "atypical belief system." This system can also be referred to by the term "delusion."[17] Dr. Wicks then explained that there are three major categories of delusions: (1) bizarre delusions held by schizophrenics; (2) atypical delusions held by

---

**15.** To be clear, Dr. Wicks' conclusions that Finley was not faking a mental disorder are *not* the same as conclusions that he was being truthful about not knowing that Schweitzer's financial instruments were fake. The validity of Dr. Wicks' diagnosis does not implicate this type of factual matter, which is for a jury to resolve.

**16.** The district court also commented on this fact in making its ruling to exclude Dr. Wicks' testimony:

It is troublesome to the Court that he admitted he makes his diagnosis based on what the consequences are. That confirms the Court's fears about what these so-called experts are doing in these cases. He is an expert in his field. But it concerns the Court what he's using his expertise for.

**17.** The following exchange occurred between Finley's counsel and Dr. Wicks:

Q. Now, is there another psychological term for atypical belief system?
A. A term that is used is a delusion.
Q. And can you explain what a delusion is?
A. It's a closed belief system in which practical—or information from the real world that comes in is so grossly distorted that the person ends up with a belief system that the average person in the culture just simply would sit back and say, "Huh? How can you believe that?"

people who "function very normally in everyday life unless you touch their delusions"; and (3) shared delusional systems known as *folie a deux*. Dr. Wicks did not classify Finley in any of these categories. He was interrupted by the government's objection shortly after presenting these three categories.

At the *Daubert* hearing, Dr. Wicks elaborated on how he diagnosed Finley as having an atypical belief system. He admitted that it was "an extremely gray diagnosis" and he "could have easily given him a diagnosis of a delusional disorder [but] that would have raised the question as to his competency in federal court" when Dr. Wicks believed that Finley was capable of assisting his attorney and understanding the court proceedings. Dr. Wicks explained his choice of terminology by saying that an "atypical belief system" is a "personality description, not a DSM–IV diagnosis." Nonetheless, Dr. Wicks believed that Finley's mental condition could fit the criteria for a delusional disorder under the DSM–IV.

We determine that Dr. Wicks' diagnosis should not be deemed unreliable based on his choice of terminology to describe the diagnosis. Dr. Wicks adequately explained his method of diagnosis to overcome any doubt that he was misdiagnosing Finley or intentionally misleading the government or the court. According to Dr. Wicks' testimony, the symptoms Finley exhibited could be described as either a delusional disorder or atypical belief system. Dr. Wicks simply chose the term, in his view, with the least potential for confusion. We have recognized that concepts of mental disorders are "constantly-evolving conception[s]" about which "the psychological and psychiatric community is far from unanimous" and a "district court may not

exclude proffered expert psychological testimony simply because the defendant's condition does not fit within the expert's— or the district court's own—concept of mental 'disorder.' " *United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir.1993) (reversing the district court's exclusion of expert testimony that the defendant had perceptual difficulties making it impossible for her to recognize counterfeit currency).

■ We conclude that the district court erred in assessing the reliability of Dr. Wicks' testimony. Dr. Wicks did not base his opinions solely on the truthfulness of Finley's statement nor does the record before us demonstrate that the diagnosis was reached through unsound methodology or reasoning. It appears from the record that Dr. Wicks' diagnosis incorporates testing, case history, interviews with the patient and family, medical factors and expert experience applying the information contained in the DSM–IV and other mental health publications. Dr. Wicks' experience with evaluating "thousands" of people should not be undervalued.

### 2. Relevance: Assist the Trier of Fact

■ The district court concluded that Dr. Wicks' testimony was not relevant because (1) the jury could make its own determination about the sincerity and veracity of Finley's beliefs, (2) the jury could also make the same observations Dr. Wicks made, and, (3) the government could not "effectively cross-examine" the expert diagnosis.[18] The government makes a similar argument to this court, contending that Dr. Wicks' testimony does not assist the trier of fact because it does not exceed the common knowledge of the trier of fact and crediting Dr. Wicks' testimony pre-

---

**18.** Indeed, the prosecution could show on cross-examination and in argument to the jury that if the jury did not credit Finley's

beliefs as testified by him and as stated to Dr. Wicks, that would be a sound basis upon which to reject Dr. Wicks' diagnosis.

cludes the jury from finding that Finley possessed the necessary *mens rea* for the crime.[19]

### a. Common Knowledge of the Trier of Fact

We reject the government's first argument and hold that the district court abused its discretion when it found that Dr. Wicks' expert opinion did not exceed the common knowledge of the average layperson.

We must be cautious not to overstate the scope of the average juror's common understanding and knowledge. As the Seventh Circuit has recognized, it is "precisely because juries are unlikely to know that social scientists and psychologists have identified [such a personality disorder] ... that the testimony would have assisted the jury in making its decision." *United States v. Hall,* 93 F.3d 1337, 1345(7th Cir.1996).

Jurors are unlikely to know that psychologists have identified a personality disorder that explains why a seemingly normal person could reject or distort certain overwhelmingly true information. Dr. Wicks' testimony would have offered an explanation as to how an otherwise normal man could believe that these financial instruments were valid and reject all evidence to the contrary. While Finley could and did testify about how and why he believed the instruments were valid, only a trained mental health expert could provide a counterweight to the government's allegations against Finley. On the basis of the record before us, Finley was entitled to present Dr. Wicks' testimony to support his defense theory.

Our case law recognizes the importance of expert testimony when an issue appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge. In *United States v. Vallejo,* 237 F.3d 1008, 1019–20 (9th Cir.2001), we reversed a trial court's decision to exclude a school psychologist's testimony that special education students whose first language is not English have difficulties communicating in English in high pressure situations. Even though this testimony was seemingly based on common sense, we stated that the expert testimony was necessary to explain how the defendant and an interrogating officer "could have very different perceptions of what occurred during the interrogation, yet could both be correct from a communications standpoint." 237 F.3d at 1019. In *Vallejo,* we relied on the logic of a First Circuit case in which the court explained: "[T]he expert testimony was needed to explain why the defendant would make 'false statements even though they were inconsistent with his apparent self-interest' when '[c]ommon understanding conforms to the notion that a person ordinarily does not make untruthful inculpatory statements.'" *Id.* at 1020 (quoting *United States v. Shay,* 57 F.3d 126, 133(1st Cir. 1995)) (concluding that the defendant should have been allowed to present expert testimony that he suffered from a mental disorder which caused him to tell grandiose, self-incriminating lies). The First Circuit reformulated the proper Rule 702 inquiry to be: "[w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved." *Shay,* 57 F.3d at 132 (citations omitted). In the instant case, the average layperson was not qualified to assess Finley's mental

---

**19.** According to the government's brief, the *mens rea* for the crime of bank fraud is "to 'knowingly' defraud various financial institutions." (Appellee's Br. 19). This is the government's Rule 704(b) argument and we will address it as such, *infra* section III.A.2.b.

condition without the assistance of an expert's specialized understanding.

The district court also concluded that several factors in Dr. Wicks' diagnosis, including the elevated levels of narcissism and Dr. Wicks' observations of Finley's physical conduct, are the kinds of observations a jury is supposed to make. We reject the notion that the jury could make the same observations as Dr. Wicks about Finley's physical demeanor and his psychological test scores. First, we note the obvious distinction between a mental health professional examining a patient in private and a jury observing a defendant testifying on the witness stand. Second, while the jury members might have been able to visually identify Finley's demeanor, they were not trained to interpret and assess those observations.[20] The government describes these as "commonsensical observations" about Finley's demeanor, but Dr. Wicks was able to carefully detail his expert ability to recognize certain symptoms based on his training and years of experience.[21] We doubt the members of the jury possess such an ability. Finally, as Dr. Wicks explained, interpreting psychological testing scores requires years of experience and training. Providing the jury with this raw information would simply not have been enough.

The court also excluded Dr. Wicks' opinion because "there's nothing that anybody can get their teeth into if you want to cross-examine him." Contrary to this position and as previously mentioned in note 18 of this opinion, all of the weaknesses the district court noted in Dr. Wicks' testimony, including the subjectivity of his conclusions and his reliance on the veracity of Finley's statements, can be properly addressed by the government on cross-examination. *See e.g., Rahm,* 993 F.2d at 1413("Any deficits in[the psychologist's] qualifications beyond her professional training go to the weight of her testimony rather than to its admissibility."). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. We note that even with the short notice the government effectively cross-examined Dr. Wicks during the *Daubert* hearing.

**b. Rule 704(b) and the Necessary Compulsion Test**

 Expert testimony that compels the jury to conclude that the defendant did or did not possess the requisite *mens rea*

---

**20.** During the *Daubert* hearing, the prosecutor asked Dr. Wicks if a jury of twelve random people would be able to determine as well as he whether Finley's beliefs were atypical. Dr. Wicks responded:

I would have to slightly disagree with that, because after 29 years of listening to psychotic, nonpsychotic, delusional, non-delusional patients, I think I have a slightly better understanding than the average jurist. I think the average jurist is very capable of making these decisions if given all the information, but I have access to some information that I am aware that they will not have access to.

**21.** Dr. Wicks explained how he conducts a clinical observation of a patient during an interview:

You're looking for indications of distractibility[sic], indications of anxiety, somebody sitting there does this (indicating) through the whole interview, tapping their hands. You look for those kinds of signs. As to more basic, when they walk through the door you look at their walk to make sure their gait is normal. If you're looking for neurological problems, sometimes you look for hand tremors. You want to determine if those hand tremors are related to his just being nervous or if this, again, is some sort of neurological impairment. So the clinical interview starts long before you even start talking to the patient.

does not "assist the trier of fact" under Rule 702 because such testimony encroaches on the jury's vital and exclusive function to make credibility determinations. Specifically, Rule 704(b) "limits the expert's testimony by prohibiting him from testifying as to whether the defendant had the mental state or condition that constitutes an element of the crime charged." *Morales*, 108 F.3d at 1035. The "rationale for precluding ultimate opinion testimony applies ... 'to any ultimate mental state of the defendant that is relevant to the legal conclusion sought to be proven.'" *United States v. Campos*, 217 F.3d 707, 711 (9th Cir.2000) (quoting S. Rep. 98–225 at 231). However, Rule 704(b) allows expert testimony on a defendant's mental state so long as the expert does not draw the ultimate inference or conclusion for the jury. *Morales*, 108 F.3d at 1037–38. It is, therefore, essential that we distinguish between expert opinions that "necessarily compel" a conclusion about the defendant's *mens rea* and those that do not.

In *Morales*, we concluded that the district court erred in barring expert testimony under Rule 704(b) because the expert's testimony did not compel the conclusion that Morales lacked the *mens rea* of the crime. Morales, charged with willfully making false bookkeeping entries, wanted an accounting expert to testify that her "understanding of accounting principles" was "weak." *Id.* at 1037. We stated:

> Even if the jury believed [the] expert testimony that Morales had a weak grasp of bookkeeping knowledge (and there was evidence to the contrary), the jury would still have had to draw its own inference from that predicate testimony to answer the ultimate factual question—whether Morales willfully made false entries. Morales could have had a

weak grasp of bookkeeping principles and still knowingly made false entries. *Id.* at 1037.

In *Morales*, we also cited with approval *United States v. Rahm*, in which we reversed the district court's exclusion of a defense expert who was going to testify that Rahm had poor visual perception and consistently overlooked important visual details. *Morales*, 108 F.3d at 1038. In *Rahm*, we drew a distinction between the ultimate issue—whether Rahm knew the bills were counterfeit—and the proffered testimony of the defendant's poor vision, from which the jury could, but was not compelled, to infer that she did not know the bills were counterfeit. *Id.* (citing *Rahm*, 993 F.2d at 1411–12).

On the other hand, we have applied Rule 704(b) to prohibit certain testimony that does compel a conclusion about *mens rea.* In *Campos*, we upheld a district court's exclusion of a polygraph expert from testifying that the defendant was truthful when she stated she did not know she was transporting marijuana. 217 F.3d at 711. We determined that the testimony compelled the conclusion that the defendant did not possess the requisite knowledge to commit the crime because polygraph test results offer an implicit opinion about whether the accused is being deceptive about the very matters at issue in the trial. *Id.* at 712.

Dr. Wicks' expert diagnosis that Finley has an atypical belief system falls into the *Morales / Rahm* line of reasoning and can be distinguished from *Campos.* The jury could have accepted the atypical belief diagnosis and still concluded that Finley knowingly defrauded the banks. If credited, Dr. Wicks' testimony established only that Finley's beliefs were rigid and he would distort or disregard information that ran counter to those beliefs. Dr. Wicks did not, and would not be allowed to, testify about Finley's specific beliefs with re-

gard to the financial instruments. The jury was free to conclude that Finley knew the notes were fraudulent, despite the rigidity of his belief system. Just as in *Morales* and *Rahm,* the defense was entitled to present evidence so that the jury could infer from the expert's testimony that the defendant lacked the necessary intent to defraud, but such a conclusion was not necessarily compelled by the diagnosis. A psychological diagnosis, unlike a lie detector test, does not automatically entail an opinion on the truth of a patient's statements. Furthermore, the psychological diagnosis can be limited such that it in no way touches upon the specific issues of fact to be resolved by the jury.[22]

We also observe that a jury is free to reject Dr. Wicks' testimony. A jury might decide that Finley was untruthful with Dr. Wicks, as the government so strenuously argues in its brief to this court. *See Vallejo,* 237 F.3d at 1020 ("allowing the expert testimony would not displace the role of the jury because, after hearing the expert testimony, the jury was free to decide that the reason for the discrepancy was Vallejo's lack of credibility—not his communications disorder").

### B. Exclusion of Dr. Wicks' Testimony as a Rule 16 Sanction

The district court also excluded Dr. Wicks' testimony as a sanction for Finley's failure to give proper notice under Fed. R.Crim.P. 16(b)(1)(C). Finley asserts that his notice complied with the requirements of Rule 16 and he should not be faulted for the government's failure to request additional discovery about Dr. Wicks' testimony as the Rule requires. Further, Finley contends that even if a discovery violation

existed, the court erroneously excluded the entire testimony. We agree.

Rule 16(b)(1)(C) allows the government to obtain information regarding a defendant's expert witness. "At the government's request," Rule 16 requires the defendant to disclose a summary consisting of the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications. Fed.R.Crim.P. 16(b)(1)(C).

Finley's counsel notified the government of their intent to present expert testimony on Finley's mental condition. In a letter dated October 1, 1999, counsel explicitly stated: "He [Finley] also has an atypical belief system, a system which is very rigid." In a second letter, dated October 25, 1999, the defense made clear: "Mr. Finley's mental condition, as set forth by Dr. Wicks, will be presented at trial to show that Mr. Finley did not have the intent to defraud, the requisite mens rea for the crime." Finley's counsel also supplemented the October 1 and October 25 letters with the psychological tests Dr. Wicks administered to Finley and provided the government with Dr. Wicks' resume disclosing his qualifications. The government did not make a motion for further disclosure of Dr. Wicks' opinion.

Later at the pretrial hearing, Finley's counsel orally explained the basic nature of Dr. Wicks' opinions. Additionally, in his written motion, Finley indicated that the testimony would support his defense theory that he did not have the required intent to commit the crimes. The motion also indicated that "[t]he testimony that Mr. Finley suffers from a very rigid 'atypical belief system' is directly relevant to Mr. Finley's attempts to ascertain the legitima-

---

**22.** Indeed, upon remand, we refer the trial court back to its own pre-trial ruling on the Rule 704(b) issue, where the court advised the government, "If a question is asked that you feel calls for Dr. Wicks to express an opinion about Mr. Finley's actual belief or the sincerity of those beliefs, you may object."

cy of the warrants and his claim that he believed them to be valid." Finally, Finley asserted that Dr. Wicks "will merely be telling the jury his determination that Mr. Finley suffers from a character disorder that is directly relevant to his defense of lack of intent." The government suggested its intent to file a motion under Rule 12.2 for a more definite statement, but the government never filed such a motion. The record does not reveal any further inquiries from the government about the nature or scope of the proposed testimony prior to Dr. Wicks taking the stand.

■■ We do not believe a violation occurred here. The disclosure may not have been as full and complete as it could have been or as the government would have liked. However, the disclosure met the minimum requirements of Rule 16(b)(1)(C). We believe that the information Finley provided to the government supplied the government with sufficient notice of the general nature of Dr. Wicks' testimony. In addition, the government does not argue that Finley failed to provide the basic information concerning Dr. Wicks' proposed testimony.

Instead, the government maintains that Finley's disclosure is deficient because it was diametrically opposed to the actual testimony at trial. The government argues that the district court properly excluded Dr. Wicks' testimony because Finley's counsel deliberately led it to believe that Finley did not have any mental disorders. We reject this argument.

Both the prosecutor and the trial judge assumed that Finley's Rule 16 disclosure limited the nature of Dr. Wicks' testimony to the precise language in the defendant's reports without further explanation. This was a misunderstanding and was not based on any deception or effort to mislead on the part of Finley's counsel. The trial court stated:

I was thinking when I ruled on his motion under Rule 704—don't interrupt me—when I ruled on this motion under Rule 704, I was thinking, what's Mr. McKeon's [sic] so worked up about? Here's somebody that's just going to come in and say that Mr. Finley has beliefs that are not typical, but he's going to say he has no mental disorder that is recognizable in the definitive book.

The court admitted that neither he nor the prosecutor understood that an "atypical belief system" was a "term of art" rather than "a lay term that doesn't amount to anything." In fact, the prosecutor explained that he interpreted the October 1 letter to indicate that Dr. Wicks would testify only that "Mr. Finley was stubborn but he wasn't mentally sick."

Nothing in this court's reading of the October 1 or October 25 letters directly supports the assumptions made by the prosecutor or the trial court about the nature of Dr. Wicks' testimony. Nothing indicates that "atypical belief system" is used as a lay term rather than a term of art. The letters stated that Dr. Wicks would testify Finley had an atypical belief system, which is exactly how he testified. In his testimony at the *Daubert* hearing, Dr. Wicks explained the nuances between applying the personality description, "atypical belief system" and making a diagnosis under the DSM–IV. Considering Dr. Wicks' testimony and the Rule 16 disclosure in their entirety, it is clear they are not in contradiction. Finally, we note the implausibility of believing that Finley would choose to present a defense theory based on expert testimony that "doesn't amount to anything" and relies on the idea that he is "stubborn rather than mentally sick." After all, the entire purpose behind the Rule 16 disclosure and the Rule 12.2 notice is to alert opposing counsel of a

mental condition bearing upon the issue of guilt.

■ Even were we to assume a violation occurred, the district court, by excluding the entire testimony, imposed a too harsh remedy for the violation. Rule 16 allows the district court to "order [a violating party] to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed.R.Crim.P. 16(d)(2).

■ Exclusion is an appropriate remedy for a discovery rule violation only where "the *omission* was willful and motivated by a desire to obtain a tactical advantage." *Taylor v. Illinois*, 484 U.S. 400, 415, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (upholding trial court's exclusion of witness where defendant deliberately failed to identify witness prior to trial) (emphasis added); *see also United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir.1991) (holding district court erred in excluding testimony of forensic pathologist because no willful or blatant discovery violation occurred).

In this case, assuming there was an omission of some sort, it was not willfully done to gain a tactical advantage. Finley's counsel disclosed the basis of Dr. Wicks' testimony. Even at the pretrial hearing, the government did not seek a further clarification of the scope of Dr. Wicks' testimony.[23] In *Taylor*, the Supreme Court suggested that even for direct discovery violations, a sanction other than preclusion would be "adequate and appropriate in most cases." 484 U.S. at 413. The severe sanction of total exclusion of the testimony was disproportionate to the alleged harm suffered by the government.

Because the Supreme Court has recognized that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," *Taylor*, 484 U.S. at 408, courts should use particular caution in applying the drastic remedy of excluding a witness altogether. In assessing the choice of sanctions, this circuit has instructed that the "decisive value" of the evidence be considered. *United States v. Duran*, 41 F.3d 540, 545 (9th Cir.1994) (examining whether the evidence was of "decisive value" or if the exclusion was "disproportionate to the conduct of counsel"). In *United States v. Scholl*, 166 F.3d 964 (9th Cir.1999), we determined that the exclusion of evidence, namely nine cashier's checks, was an appropriate sanction for a discovery rule violation. *Id.* at 972. Scholl's counsel possessed the cashier's checks for sometime, but only disclosed them after the start of trial. We allowed the exclusion, in part, because we determined that the checks did not have decisive value as the information contained in the checks was presented to the jury through testimony. *Id.*

Here, Dr. Wicks' testimony is essential to the defense. Dr. Wicks presented the only evidence of Finley's diagnosed mental disorder, and the court excluded the entire testimony. Finley's counsel did not have any other way of explaining the possibility that Finley suffered from a mental disorder. For this reason, we determine that the prejudice resulting from the error cannot be construed as harmless. *See Peters*, 937 F.2d at 1426(explaining the applicability of harmless error rests upon determin-

---

23. We observe that the government does not come into this argument without some discovery failures of its own. Prior to trial, the district court criticized the government for failing to disclose its expert witness. The court postponed the trial until Finley's coun- sel deposed the government's expert. While we do not condone such tactics, we note that both sides may have failed to give the opponent full and complete information relating to an expert's proposed testimony.

ing that the prejudice resulting from the error was more probably than not harmless).

## IV. CONCLUSION

We offer some comments on remand. The government may offer evidence to challenge Dr. Wicks' opinion that Finley suffered from any form of delusion. The government may also request another *Daubert* hearing prior to trial and call its own witnesses.

Finley was entitled to present his defense to *the jury* with the use of expert testimony that meets the standards of relevance and reliability expressed in this opinion. Accordingly, we REVERSE and REMAND for proceedings consistent with this opinion.