**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee*,

v.

JESUS EDER MORENO ORNELAS,
AKA Jesus Edgar Juanni Moreno,
AKA Jesus Eder Mendivel-
Mendivel,
        *Defendant-Appellant.*

No. 15-10510

D.C. No.
4:14-cr-01568-
CKJ-EJM-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted May 15, 2018
San Francisco, California

Filed October 25, 2018

Before: Sidney R. Thomas, Chief Judge, Michelle T.
Friedland, Circuit Judge, and Thomas S. Zilly,[*]
District Judge.

---

[*] The Honorable Thomas S. Zilly, United States District Judge for
the Western District of Washington, sitting by designation.

Opinion by Judge Friedland;
Partial Concurrence and Partial Dissent by
Chief Judge Thomas;
Dissent by Judge Zilly

**SUMMARY**\*\*

### Criminal Law

The panel affirmed the defendant's convictions for assault on a federal officer, use of a firearm during and in relation to a crime of violence, possession of a firearm by a convicted felon, and possession of a firearm by an illegal alien; reversed his convictions for attempted robbery of the officer's gun and attempted robbery of the officer's truck; and remanded.

The panel held that in instructing the jury on the elements of attempted robbery under 18 U.S.C. § 2112, the district court was correct not to instruct the jury that the defendant must have formed the specific intent to steal by the time he used force, but plainly erred by omitting an instruction that, to convict, the jury needed to conclude beyond a reasonable doubt that the defendant had formed the specific intent to steal the gun and truck by the time he tried to take them. The panel held that the obvious instructional error affected the defendant's substantial rights and seriously undermined the fairness and integrity of the proceedings.

---

\*\* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the defendant's contentions that the jury instructions were flawed in two additional ways that warrant reversal of his other convictions. The panel held that the general self-defense instruction given at trial adequately covered the defendant's resistance-to-excessive-force theory of the case. With respect to the defendant's convictions under 18 U.S.C. § 111 for assault on a federal officer and under 18 U.S.C. § 924(c) for use of a firearm during and in relation to a crime of violence (the assault), the panel held that the instruction for determining whether the officer was engaged in the performance of "official duties" was appropriate.

The panel held that the district court did not abuse its discretion by excluding expert testimony the defendant belatedly sought to introduce at trial.

Chief Judge Thomas dissented from the majority's reversal of the defendant's attempted robbery convictions, and concurred in the remainder of the majority opinion. He wrote that under the limited standard of review for plain error, the defendant failed to demonstrate that any instructional error was not harmless in light of his post-arrest admissions.

Dissenting in part, District Judge Zilly wrote that the district court's exclusion of the defendant's expert witness, without any finding that the defendant engaged in willful or blatant conduct, violated the defendant's fundamental right to due process, requiring reversal and a new trial on all appealed counts.

**COUNSEL**

Carlton F. Gunn (argued), Pasadena, California, for Defendant-Appellant.

Angela W. Woolridge (argued), Assistant United States Attorney; Robert L. Miskell, Appellate Chief; Elizabeth A. Strange, Acting United States Attorney; United States Attorney's Office, Tucson, Arizona; for Plaintiff-Appellee.

**OPINION**

FRIEDLAND, Circuit Judge:

On a summer day in the Arizona desert, not far from our country's southern border, United States Forest Service Officer Devin Linde ("Linde") encountered Defendant-Appellant Jesus Eder Moreno Ornelas ("Moreno"). A struggle ensued. Afterwards, each man claimed that the other had forced him into a fight for his life. Moreno was convicted at trial of multiple federal crimes. We reverse his convictions for attempted robbery of Linde's gun and vehicle because there was plain error in the jury instructions on those counts, but we otherwise affirm.

**I.**

Linde was responsible for patrolling a vast swath of mountainous desert stretching across Arizona and New Mexico and running down to the Mexican border, which contained areas of National Forest. Apart from the Forest Service, the United States Border Patrol was the only law enforcement agency operating in that remote area. While carrying out his duties, Linde often encountered people who had crossed the border unlawfully, some of whom were

smuggling drugs.  Many of those people fell victim to the heat and harsh terrain.  Stranded without food and water, they sometimes sought help from federal officers on patrol. Linde carried water and other supplies in his truck to prepare for such encounters.

## A.

One day during a patrol, Linde received a report of suspicious people walking along a road near an area of National Forest.  Linde called Border Patrol and was asked to respond.  As he had many times before, Linde agreed to assist and set out in his truck, which was clearly marked as a law enforcement vehicle.  Before long, he encountered two men, one of whom had scrapes and scratches on his face. The other, who did not appear injured, was Moreno.

The two men walked up to the truck.  Linde offered them water, but they declined.  Linde then directed Moreno and his companion to come to the front of the truck and put their hands on the hood.  The injured man complied, but Moreno did not.  With verbal commands failing, Linde drew his gun. A struggle between Linde and Moreno began moments later, the details of which are in dispute.[1]

## 1.

Linde testified in Moreno's subsequent jury trial that he ordered Moreno to turn away and put his hands on his head. This time, Moreno complied.  Linde approached with his gun drawn.  When he was a few feet away, Linde holstered

---

[1] The injured man appears to have fled during the struggle.

his weapon and pulled out handcuffs. After cuffing Moreno's right hand, Linde began to cuff Moreno's left.

At trial, Linde admitted not remembering exactly what happened next, but he recalled being yanked forward, then going blank. The next thing he knew, he and Moreno were fighting. Moreno went for the gun. Linde threw his hands down to his holster, one covering the handle of the gun, the other fending off Moreno.

Moreno responded by throwing Linde to the ground. Entangled, the two men rolled towards an embankment on the side of the road. Moreno started pummeling Linde in the face. Linde blacked out briefly before feeling his gun being pulled out of its holster. Two shots rang out. Having lost control of his weapon, Linde flailed his arms, searching for the gun.

Linde testified that he located the weapon right before Moreno could take aim at his chest. Linde pushed Moreno's hand away and then rolled onto his side, just as another shot discharged near his head. Linde grabbed Moreno's wrist, trying to keep the gun pointed away. Moreno nearly broke free, but Linde grabbed him by the neck, wrapped his leg around Moreno's throat, and squeezed. Moreno fired several shots skyward before dropping the gun.

Linde grabbed it. He aimed at Moreno and pulled the trigger. Nothing happened. Linde rolled away, backing up to put distance between them. Moreno—on his knees, hands in the air—cried "no, no, no, no." Thinking the clip was empty, Linde reloaded. Moreno bolted for the truck.

As Moreno ran, Linde realized that the gun was jammed. Linde quickly cleared the jam but, knowing that his truck contained no weapons and that its security system would

prevent Moreno from driving away, did not fire. Instead, as he told the jury, Linde went to the truck, aimed the gun at Moreno's chest, and threatened to kill him if he moved. Linde then grabbed the radio and reported, "Shots fired."

**2.**

Moreno gave law enforcement a very different account of the incident. In a post-arrest interview that was recorded and later played for the jury, Moreno admitted that he initially refused to comply with Linde's commands but claimed that he sat down as the officer approached with handcuffs. By Moreno's telling, Linde never holstered the gun but instead kept his finger on the trigger, with the barrel pointed at Moreno. Fearing for his life and wanting to return to Mexico rather than go to prison, Moreno tried to grab the gun. A shot went off. Moreno tackled Linde with all the force he could muster. Two more shots rang out as the two men struggled on the ground, each trying to wrest the gun from the other.

Moreno claimed that, by this point, he could have beaten Linde unconscious. Instead, Moreno slammed Linde's hand onto the ground, forcing him to release the gun. Moreno seized it, fired the remaining rounds into the air, and tossed the gun aside. He ran for the truck, thinking he would drive to the border and leave it there.

Moreno recounted that, when he got behind the wheel, he suddenly realized that he had been acting stupidly and that he should not drive away. For that reason, Moreno explained, he got out of the truck and gave himself up voluntarily.

**B.**

Moreno was charged with assault on a federal officer, attempted murder of a federal officer, use of a firearm during and in relation to a crime of violence, possession of a firearm by a convicted felon, possession of a firearm by an illegal alien, attempted robbery of Linde's gun, attempted robbery of Linde's truck, and illegal reentry. At trial, the jury hung on the attempted murder charge but convicted on the others. The district court sentenced Moreno to just over 43 years in prison.

**II.**

On appeal, Moreno challenges all of his convictions except the one for illegal re-entry. We reverse both of Moreno's convictions for attempted robbery but affirm the rest.

**A.**

Moreno argues that the jury instructions given at trial did not accurately define the elements of attempted robbery under 18 U.S.C. § 2112. The district court instructed that, for the jury to convict Moreno of attempted robbery under that statute, the Government had to prove that he "did take or attempt to take from the person or presence of another any kind or description of personal property belonging to the United States," and that he "did so by force and violence, or by intimidation." Although Moreno requested an instruction requiring the Government to prove that he acted with the "intent to steal" and that his use of "force or intimidation" was "directly related" to the attempted taking, he acknowledges that he did not object when the district court instructed the jury differently at trial. We may therefore

review only for plain error.  *See Jones v. United States*, 527 U.S. 373, 388 (1999); *see also* Fed. R. Crim. P. 30(d).

On appeal, Moreno maintains that the district court plainly erred in two ways in instructing the jury on the elements of attempted robbery under § 2112: (i) by failing to instruct that Moreno must have possessed the specific intent to steal; and (ii) by failing to instruct that Moreno must have formed such intent by the time he used force, not just by the time he tried to take the property in question.  We agree with the first contention but reject the second.

**1.**

We may reverse for plain error only if four conditions are met.  "First, there must be an error that has not been intentionally relinquished or abandoned."  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016).  "Second, the error must be plain—that is to say, clear or obvious."  *Id.* "Third, the error must have affected the defendant's substantial rights," which in cases like this one means that there is "'a reasonable probability that, but for the error,' the outcome of the proceeding would have been different."  *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004)); *see also, e.g.*, *United States v. Conti*, 804 F.3d 977, 981 (9th Cir. 2015).  If those conditions are met, we will exercise our "discretion to correct the forfeited error if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'"  *Molina-Martinez*, 136 S. Ct. at 1343 (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

**2.**

Although the district court was correct not to instruct the jury that Moreno must have formed the specific intent to

steal by the time he used force, the court was wrong—and plainly so—to omit an instruction on specific intent altogether.

The statute under which Moreno was charged with attempted robbery of Linde's gun and truck punishes "[w]hoever robs or attempts to rob another of any kind or description of personal property belonging to the United States." 18 U.S.C. § 2112. Although the statute does not further define "robs or attempts to rob," *see id.*, those terms had "established meanings at common law," *Carter v. United States*, 530 U.S. 255, 266 (2000). And when "Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice," we presume that Congress "knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Id.* at 264 (emphasis omitted) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)). Thus, when Congress has "simply punished" a common law crime, Congress has "thereby le[ft] the definition of [the offense] to the common law." *Id.* at 267 n.5. In fact, the Supreme Court has pointed to this very robbery statute as an example of this legislative method.[2] *See id.* (citing 18 U.S.C. § 2112). We accordingly "turn to the common law for guidance" in interpreting the statutory phrase "robs or attempts to rob." *Id.* at 266.

---

[2] In *Carter*, the Supreme Court distinguished the statute at issue here (§ 2112 robbery of government property) from that at issue there (§ 2113 bank robbery). *See* 530 U.S. at 267 & n.5. Because § 2113, unlike § 2112, spells out elements of the offense and does not simply punish "robbery," the Court declined to import elements of common law robbery not specifically enumerated in the text of § 2113. *See id.* at 264–67.

At common law, robbery was "the felonious and forcible taking, from the person of another, of goods or money [of] any value by violence or putting him in fear."  4 W. Blackstone, Commentaries on the Laws of England 241 (1769).  In addition to requiring a defendant to assault another person and take his things, this definition required the defendant to take them with "felonious intent."**[3]** *Id.*  And "felonious" is just "a common-law term of art signifying an intent to steal."  *Carter*, 530 U.S. at 278 (Ginsburg, J., dissenting); *accord United States v. Lilly*, 512 F.2d 1259, 1261 (9th Cir. 1975) (observing that "feloniously" was "recognized as signifying the element of specific intent to steal in robbery at common law").

Common law robbery was therefore a specific intent crime.  *See, e.g.*, *Lilly*, 512 F.2d at 1261; *United States v. Klare*, 545 F.2d 93, 94 (9th Cir. 1976); 3 Wayne R. LaFave,

---

**[3]** For completed robbery at common law, there must have been a taking involving some degree of "asportation," *Carter*, 530 U.S. at 272, which meant "at least a slight movement" of the property, 3 Wayne R. LaFave, Substantive Criminal Law § 20.3(a)(2) (3d ed. 2017).  But attempted robbery could not have required the same, because it would otherwise have collapsed into the completed offense. *Cf.* 4 Blackstone at 231 (observing that even the "bare removal from the place in which [the thief] found the goods, though the thief d[id] not quite make off with them, is a sufficient asportation, or carrying away" for completed larceny).  Instead, attempted robbery "at common law require[d] proof that the defendant . . . took some overt act that was a substantial step toward committing" robbery with the requisite intent. *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1190 (9th Cir. 2000) (en banc) (addressing common law attempt generally).  Given our reversal here based on the omission from the jury instructions of the specific intent element, we need not also rule on Moreno's new argument on appeal regarding the district court's failure to instruct the jury on the substantial step element.

Substantive Criminal Law § 20.3(b) (3d ed. 2017). That meant, for example, that a defendant accused of "snatching [a] pistol" was not guilty of robbery at common law if he had "not . . . intended at the time to steal it" and intended instead to "prevent its being used against [hi]m." *Jordan v. Commonwealth*, 66 Va. (25 Gratt.) 943, 948 (1874). This principle held true even if a defendant later formed an intent to permanently deprive the owner of the property—thus, a defendant was not guilty of robbery even if after "t[aking] a gun by force . . . under the impression that it may be used against him," he admitted "that he w[ould] sell the gun." *R v. Holloway* (1833), 5 Car. & P. 524, 524–25. Common law robbery—and by extension common law attempted robbery—thus required the defendant to have formed the specific intent to steal by the time he took the property in question.[4]

But, at common law, the defendant need not have formed the specific intent to steal by the time he used or threatened to use *force*. To the contrary, it was enough for a defendant to "take[] advantage of a situation which he created for some other purpose." 3 LaFave § 20.3(e). As a result, a defendant "who str[uck] another, perhaps intentionally but with no intent to steal . . . and who then, seeing his adversary helpless, t[ook] the latter's property" was guilty of robbery. *Id.* & n.98 (collecting cases)[5]; *see also, e.g.*, *R v. Hawkins*

---

[4] For a defendant to possess the specific intent to steal, he need not intend "to convert the property to [his] own use; it is sufficient that there is an intention to permanently deprive the owner of the property." 3 LaFave § 20.3(b); *see also Carter*, 530 U.S. at 268 (equating the "specific intent" to steal with the intent to "permanently . . . deprive" the victim of its property).

[5] We recognize that this well-regarded treatise is not entirely consistent on this point. Another section of the treatise suggests that the

(1828), 3 Car. & P. 393, 393 (observing that where "a gang of poachers attack[ed] a game-keeper, and le[ft] him senseless on the ground," the "one of them [who] return[ed] and st[ole] his money" was guilty of robbery even if he and the others had attacked only to "resist the keeper[']s" efforts at preventing poaching).  The same was true of a defendant who threatened a woman with the intent to rape her, only to accept her offer of money instead.  *See R v. Blackham* (1787), 2 East P.C. 711, 711.

It follows that a defendant would have committed attempted robbery at common law if he struck another without the specific intent to steal and then reached to take the helpless adversary's property—only to be thwarted in carrying out his freshly formed specific intent to steal by the timely arrival of a constable.  *See* 2 LaFave § 11.3(a) (describing the requisite mental state for attempt as "the intent to do certain proscribed acts or to bring about a certain proscribed result"); *see also United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1193 (9th Cir. 2000) (en banc) ("The reason for requiring specific intent for attempt crimes is to resolve the uncertainty whether the defendant's purpose was indeed to engage in criminal, rather than innocent, conduct.").

Congress's use of the common law terms "robbery" and "attempted robbery" in § 2112 imported the common law meanings of those terms.  The district court therefore should have instructed the jury that, to convict Moreno of attempted robbery, it needed to conclude beyond a reasonable doubt

---

specific intent to steal must coincide with the use or threatened use of force, but that section is unpersuasive because it relies only on a single modern case analyzing a state robbery statute.  *See* 1 LaFave § 6.3(a) & n.11 (citing *People v. Green*, 609 P.2d 468, 498-500 (Cal. 1980)).

that he had formed the specific intent to steal the gun and truck by the time he tried to take them, though not necessarily by the time he used force against Linde. And, given the well-settled elements of common law robbery as well as *Carter*'s clear indication that § 2112 incorporates the common law, failing to instruct the jury on specific intent was an obvious omission.[6]

### 3.

That obvious instructional error affected Moreno's substantial rights, and it seriously undermined the fairness and integrity of the proceedings. *See Molina-Martinez*, 136 S. Ct. at 1343. We therefore reverse both of Moreno's convictions for attempted robbery.

To begin, there is a reasonable probability that failing to instruct the jury that Moreno must have had the specific intent to steal the gun—that is, the specific intent to permanently deprive Linde of the weapon—affected the jury's verdict. Again, Moreno claimed that he grabbed the gun to avoid being shot. Even if the jury did not believe that Moreno reasonably feared for his life before the struggle, the jury might well have believed Moreno when he said that he "struggled with the officer for all the bullets to be fired" so that he "could go to Mexico," and that he tossed the gun

---

[6] Indeed, even as to robbery statutes that, unlike § 2112, require only general intent for the completed offense, we have required specific intent for an attempt. *See, e.g.*, *United States v. Goldtooth*, 754 F.3d 763, 770 (9th Cir. 2014) (requiring specific intent for attempted robbery within the special maritime and territorial jurisdiction of the United States under 18 U.S.C. § 2111); *United States v. Darby*, 857 F.2d 623, 626 (9th Cir. 1988) (requiring specific intent for attempted bank robbery under 18 U.S.C. § 2113(a)).

aside once he had emptied the clip.**[7]**  On those facts, Moreno would have lacked the specific intent to steal.  Accordingly, Moreno has shown that the evidence was not "overwhelming" as to the omitted element, and thus has convinced us that the plain instructional error affected his substantial rights.  *United States v. Nguyen*, 565 F.3d 668, 677 (9th Cir. 2009); *see also Conti*, 804 F.3d at 981–82 (collecting plain error cases).

The same is true of the attempted robbery conviction related to the truck.  Recall Linde's testimony.  He told the jury that, in the heat of the struggle, he tried to shoot Moreno but the gun did not fire.  Linde then rolled away from Moreno, who was left kneeling on the ground, pleading for his life.  Linde reloaded, and Moreno ran for the truck.  On those facts, the jury could have found that Moreno intended to flee for fear of being shot, rather than with intent to steal the truck.  And given how close to Mexico the struggle occurred, Moreno's statement that he planned to abandon the truck at the port of entry left room to conclude that he expected all along that the truck would be recovered.  Failing to instruct on specific intent thus affected Moreno's substantial rights on this count too.**[8]**

---

**[7]** Chief Judge Thomas's dissent argues that Moreno's admission that he intended to "throw [the gun] away in the desert," shows he intended to permanently deprive Linde of the gun.  But given that the struggle occurred in the desert, the jury could just as easily have concluded that Moreno intended to toss the gun out of reach but not in a way that would prevent Linde from later locating it.

**[8]** All that said, construing the trial record in favor of the Government, we reject Moreno's contention that no reasonable jury could find that he had the specific intent to steal as to either attempted robbery count.  *See United States v. Nevils*, 598 F.3d 1158, 1169 (9th

Finally, the error seriously affected the fairness and integrity of the proceedings.  As in *United States v. Paul*, 37 F.3d 496 (9th Cir. 1994), the "instructions improperly deprived [the defendant] of his right to have a jury determine an essential element" of the offense: "mental state."  *Id.* at 501.  Also as in *Paul*, the jury was presented with a version of the events under which the requisite mental state was lacking.  *See id.* at 500.  Thus, following *Paul*, we correct the instructional error in this case because "a miscarriage of justice would otherwise result."  *Id.*

**B.**

Moreno maintains that the jury instructions were flawed in two additional ways that warrant reversal of his other convictions.  First, Moreno urges us to reverse all of his remaining convictions on the ground that the jury instructions given at trial failed to present resistance to excessive force as a defense, and that the instructions thus failed to cover his theory of the case.  Second, Moreno challenges his convictions for assault on a federal officer under 18 U.S.C. § 111 and for use of a firearm during and in relation to a crime of violence (the assault) under 18 U.S.C. § 924(c), contending that the instructions improperly defined "official duties."  Neither argument is persuasive.

---

Cir. 2010) (en banc) (rejecting a sufficiency of the evidence challenge because the evidence at trial was not "so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt").  Accordingly, the Government is not prohibited from retrying Moreno on the attempted robbery counts.  *See, e.g.*, *United States v. Shipsey*, 190 F.3d 1081, 1088-89 (9th Cir. 1999).

**1.**

Moreno's theory of the case was that Linde, by pointing his gun directly at Moreno, used excessive force—and that Moreno thus acted in reasonable self-defense from the start. In line with that theory, Moreno requested an instruction observing that "[a] person has a right to resist an officer who is using excessive force" to supplement our court's model instruction on general self-defense.[9]  The district court declined to add that language to the model instruction. Moreno objected.

As a criminal defendant, Moreno had "a constitutional right to have the jury instructed according to his theory of the case" so long as the instruction he requested was "supported by law and ha[d] some foundation in the evidence." *United States v. Marguet-Pillado*, 648 F.3d 1001, 1006 (9th Cir. 2011) (first quoting *United States v. Johnson*, 459 F.3d 990, 993 (9th Cir. 2006), then quoting *United States v. Bello-Bahena*, 411 F.3d 1083, 1088–89 (9th Cir. 2005)).  If the district court failed to give such an instruction, we would have to reverse unless "other instructions, in their entirety, adequately cover[ed]" Moreno's theory of the case. *Id.* (quoting *United States v. Thomas*, 612 F.3d 1107, 1120 (9th Cir. 2010)).  We assume without deciding that Moreno's excessive force instruction was supported by law and had some foundation in the evidence, but we hold on de novo review that the general self-defense instruction given at trial adequately covered

---

[9] We use the term "general" to differentiate this model instruction from the model instruction geared specifically to a charge under § 111 of assault against a federal officer, which will be discussed below. *Compare* Ninth Circuit Model Criminal Jury Instruction No. 6.8 (general self-defense instruction), *with id.* No. 8.5 (§ 111 self-defense instruction).

Moreno's resistance-to-excessive-force theory. *See Bello-Bahena*, 411 F.3d at 1089.

Following our court's model instruction on general self-defense, the district court instructed the jury that the "[u]se of force is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force," and that "[t]he government must prove beyond a reasonable doubt that [Moreno] did not act in reasonable self-defense." *See* Ninth Circuit Model Criminal Jury Instruction No. 6.8. That instruction left Moreno ample room to argue that Linde's use of force was excessive and therefore "unlawful"—and that Linde's use of (allegedly) excessive force justified Moreno's attempt to grab the gun. Indeed, Moreno's closing argument made those very points. Thus, even if express language on excessive force might have helped Moreno, and even if such language would have done no harm, its absence did not "impair [Moreno's] right to have the jury decide whether the government ha[d] proven" that he had not acted in reasonable self-defense.[10] *Marguet-Pillado*, 648 F.3d at 1009 (emphasis omitted).

---

[10] For three reasons, it also does not matter that the district court declined to instruct the jury on a justification defense specific to the two counts of unlawful possession of a firearm. First, the general self-defense instruction allowed Moreno to argue not only that he was justified in wrestling the gun away from Linde, but also that (by extension) he was justified in possessing the gun despite his prior felony conviction and immigration status—which is precisely what Moreno's closing argument contended. Second, Moreno was in some ways better off without the proposed justification instruction. For example, the self-defense instruction given at trial put the burden on the Government to prove a lack of self-defense beyond a reasonable doubt, but Moreno's proposed justification instruction would have put the burden on Moreno to prove justification by a preponderance of the evidence. Third,

Contrary to Moreno's contentions, *United States v. Span*, 970 F.2d 573 (9th Cir. 1992) ("*Span I*"), and *United States v. Span*, 75 F.3d 1383 (9th Cir. 1996) ("*Span II*"), do not require a different result.   In those two cases we confronted—on direct appeal and collateral review, respectively—a different instruction on a different record. The problematic instruction in the *Span* cases was our court's model instruction geared specifically towards the charge of assault on a federal officer.   That instruction shielded from guilt only defendants who (1) "reasonably believed that use of force was necessary to defend [themselves] against an immediate use of unlawful force," (2) "used no more force than appeared reasonably necessary in the circumstances," *and* (3) "did not know that [the alleged victims] were federal officers."   *Span I*, 970 F.2d at 576; *see also Span II*, 75 F.3d at 1387–88.   As we observed in *Span I*, that instruction "allow[ed] the government to defeat an excessive force theory of defense merely by proof beyond a reasonable doubt that the defendant knew that the person that [the defendant] allegedly assaulted was a federal law enforcement officer."   970 F.2d at 577.   The district court's instruction in *Span* thus precluded an acquittal even if the jury "believed that the [officers'] exercise of force . . . was unlawful because it was excessive" and "found that the [defendants] reasonably defended themselves from that unlawful exercise of force."   *Id.*

---

although the general self-defense instruction referenced the "[u]se of force" without expressly mentioning possession of a firearm, the district court gave that instruction after instructing the jury on the elements of every charge at issue in the trial.  Giving the instructions in that order suggested that the self-defense instruction applied beyond just the assault and attempted murder charges.

The general self-defense instruction given at Moreno's trial, by contrast, did not hinge on whether Moreno knew that Linde was a federal officer. That being so, the jury in Moreno's case was not led to believe that, "regardless of the amount of force used by" Linde, Moreno "had no legal right to do anything except [to] submit." *Span II*, 75 F.3d at 1390. Rather, to reiterate, the jury was instructed that the "[u]se of force is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force."

To be sure, we observed in *Span I* that "the general self-defense instruction offered by the [defendants] d[id] not amount to a proposed instruction on the right to offer reasonable resistance to repel any excessive force used by federal law enforcement officers." 970 F.2d at 578. But we did so while emphasizing that the defendants had neither presented at trial an excessive force theory of self-defense nor preserved for direct appeal a challenge to the district court's use of a self-defense instruction foreclosing that otherwise very promising theory. *See id*. And it is true that, in *Span II*, we faulted trial counsel for "failing to request an instruction that . . . self-defense in the face of an excessive use of force . . . is an affirmative defense." 75 F.3d at 1389. But we did so while holding that trial counsel was constitutionally ineffective for failing to present an excessive force theory or to preserve a challenge to the self-defense instruction given at trial. *See id.* at 1389–90. We did not consider in *Span I* or *Span II* whether a general self-defense instruction that did not depend on lack of knowledge of officer status (if given) would adequately cover an excessive force theory of self-defense (if presented). Having confronted that question for the first time today, we hold that the general self-defense instruction given at Moreno's trial

adequately covered the excessive force theory of self-defense that he presented to the jury.

**2.**

To convict Moreno of assaulting a federal officer, the jury needed to find that he assaulted Linde while the officer was "engaged in . . . the performance of [his] official duties."[11]  18 U.S.C. § 111(a)(1).  Moreno argues that, by improperly defining "official duties," the jury instruction given by the district court misstated an element of the offense.  Moreno objected to the instruction at trial, so on appeal we consider this contention de novo.  *See United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010).

The district court instructed the jury that "the test" for determining whether an officer is "[e]ngaged in the performance of official duties" is "whether the officer is acting within the scope of his employment, that is, whether the officer's actions fall within his agency's overall mission, in contrast to engaging in a personal frolic of his own."  The district court added that the question was not "whether the officer is abiding by laws and regulations in effect at the time of the incident" or "whether the officer is performing a function covered by his job description."  That instruction was appropriate.[12]  *See United States v. Juvenile Female*, 566 F.3d 943, 950 (9th Cir. 2009) (describing the test for

---

[11] The statute further punishes those who assault federal officers "on account of" their official duties, 18 U.S.C. § 111(a)(1), but the Government has not relied on that clause here.

[12] There was sufficient evidence at trial to support a finding that Linde was performing his official duties.  For example, Linde testified that he was routinely tasked with assisting Border Patrol, and that he was doing just that when he encountered Moreno.

whether an officer is engaged in an official duty under § 111 as "whether he is acting within the scope of what he is employed to do, as distinguished from engaging in a personal frolic of his own" (quoting *United States v. Lopez*, 710 F.2d 1071, 1074 (5th Cir. 1983))); *accord United States v. Hoy*, 137 F.3d 726, 729 (2d Cir. 1998).

## C.

Moreno's final argument on appeal is that the district court abused its discretion by excluding expert testimony he belatedly sought to introduce at trial.  We disagree.

### 1.

On February 3, 2015—five months after trial counsel was appointed to represent Moreno—the district court granted Moreno's third request for a continuance and pushed the trial date from February 18 to April 7.  In the same order, the district court set a clear deadline for the parties to request disclosures mandated by Federal Rule of Criminal Procedure 16—requiring that such requests be made within two weeks and that the parties respond within seven days of receiving one.  As relevant here, Rule 16 requires a defendant to reciprocate government disclosure of expert witnesses by disclosing, "at the government's request . . . . a written summary" of any expert "testimony that the defendant intends to use" at trial. Fed. R. Crim. P. 16(b)(1)(C)(i).  Rule 16 further instructs that "[if] a party fails to comply with this rule," the district court may "prohibit that party from introducing the undisclosed evidence."  Fed. R. Crim. P. 16(d)(2)(C).

On February 13, the Government represented that it had complied with a request from Moreno for disclosure of the Government's expert witnesses.  It then requested reciprocal

disclosure, which under Rule 16 had to include the defense expert "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). Seven days came and went. Then two more months went by, until on April 16—two weeks after the trial date was pushed from April 7 to June 23—Moreno informed the Government at a status conference that an expert named Weaver Barkman "would be potentially assisting the defense." Moreno provided no further information.

On June 1—six weeks after the status conference and three weeks before trial—Moreno filed a formal notice that he intended to call Barkman as an expert witness. Moreno's filing listed Barkman's qualifications and stated that Barkman would likely "provide more information regarding the Glock pistol fired in this case." The filing represented that trial counsel could not yet provide a summary of Barkman's proposed testimony because Barkman had "not yet finished viewing the evidence in th[e] case." A week later, Moreno filed his sixth request for a continuance, in part to allow Barkman time to finish his report. The district court denied the request the next day.

On June 18—four months after Moreno's expert disclosures were due and a mere five days before trial—the Government finally received Barkman's expert report. The report indicated that Barkman would testify that the available physical evidence suggested that Linde never holstered his gun, the gun could have slipped out of the holster accidentally, several shots were accidentally fired, and no shot was fired near Linde's head.

The Government moved to exclude Barkman's testimony. It argued that Moreno's disclosure was "incredibly untimely" and, in the alternative, that Barkman's testimony would be inadmissible for evidentiary reasons.

The district court granted the Government's motion "based on [a] lack of timeliness and failure to follow the Court's orders," explaining that the "whole idea" of setting a deadline was for the parties to "disclose expert opinions early enough . . . so the other side c[ould] have an opportunity to evaluate those opinions and hire his or her own expert prior to trial to meet those opinions."[13]

## 2.

Relying on his constitutional right to present witnesses in his own defense, Moreno argues that the district court abused its discretion in imposing the "sanction" of excluding Barkman's expert testimony. Such a sanction, he maintains, is inappropriate for a discovery violation unless the violation was found to be willful and blatant, and the district court made no such findings here.

Like the government in *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) (en banc), Moreno "mischaracterizes the enforcement order[] as an exclusionary 'sanction.'" *Id.* at 514. The exclusion here, as in *W.R. Grace*, was no sanction. It "simply enforce[d] the [district court's] earlier pretrial order" setting disclosure deadlines. *Id.* And so far as we can tell from the record, as well as from Moreno's own representations on appeal, Moreno "did not object to the disclosure deadline[] set by the [district court's pretrial] order." *Id.* The exclusion thus "could hardly have been a surprise." *Id.* Moreover, in view of Moreno's "acquiescence" to the disclosure deadline when it was set, along with the several months of trial preparation

---

[13] Having excluded the expert testimony on timeliness grounds, the district court did not rule on the Government's evidentiary objections to the testimony.

that had already occurred by that point, we see nothing unreasonable about the deadline.  *See id.*

Moreno is correct that we distinguished between the government and criminal defendants in *W.R. Grace*.  But we did so with respect to the appropriate standard for excluding a witness as a "sanction"—an issue we discussed while affirming the district court's exclusion order on the alternative ground that the exclusion was appropriate even if viewed as a sanction.  *See id.* at 514–15.  We did not similarly cabin our earlier, independent holding that simply enforcing reasonable deadlines established in a pretrial order is not a sanction in the first place.[14]  The cases cited by Judge Zilly in dissent do not hold otherwise.[15]   *W.R. Grace* therefore controls.

---

[14] It also makes no difference that we did not decide in *W.R. Grace* "whether or to what extent the defense can be compelled to disclose a list of its witnesses before trial."  526 F.3d at 509 n.7.  That footnote, read in context, clearly referred to disclosure of a list of *nonexpert* witnesses, which Rule 16 requires of neither party.  *See id.* at 510 (holding that, "[a]lthough Rule 16 does not expressly mandate the disclosure of nonexpert witnesses," district courts may nevertheless "order the government to produce a list of such witnesses as a matter of its discretion").  The present case, by contrast, concerns *expert* witnesses, which Rule 16 expressly requires both parties to disclose under these circumstances.  *See* Fed. R. Crim. P. 16(a)(1)(G), (b)(1)(C).

[15] In *United States v. Verduzco*, 373 F.3d 1022 (9th Cir. 2004), we did not even reach the question whether it would have been an abuse of discretion to exclude the expert's testimony because of a minor discovery violation, as we resolved the issue on Rule 403 grounds instead.  *Id.* at 1033 (stating only that there "might" have been an abuse of discretion if the district court had excluded the expert solely on discovery violation grounds).  In *United States v. Peters*, 937 F.2d 1422 (9th Cir. 1991), the government conceded that, unlike here, "it never sought an order for an exchange of witness lists prior to trial, nor was

Moreno counters that the district court's order required him to disclose only expert testimony that he "intend[ed]" to use at trial, and that he had not yet intended to call Barkman when the disclosure deadline came and went. This argument is meritless, for it would render deadlines meaningless. By requiring the parties to disclose by a certain date expert witnesses whom they intended to call at trial, the district court required the parties to figure out before that date whom they wanted to call.

*United States v. Schwartz*, 857 F.2d 655 (9th Cir. 1988), is not to the contrary. In *Schwartz*, a fellow defendant flipped at the eleventh hour, and the government sought to call him as a cooperating witness at trial. *Id.* at 656. Although the newly minted cooperator had not been

---

there any agreement between counsel regarding the exchange of such lists." *Id.* at 1424-25. In the absence of such a request, the defendant did not actually have any affirmative disclosure obligation under Rule 16 that the district court could have sought to enforce. Fed. R. Crim. P. 16(b)(1)(C) (requiring that the government make a disclosure request to the defendant). Our holding that the sanction was impermissible because no willful and blatant discovery violations had occurred was a response to the government's alternative argument that, even if the defendant's attorney did not commit a clear-cut violation of any discovery rule, the witness was properly excluded because defense counsel deliberately failed to divulge the existence of the expert witness to get an advantage at trial. *Peters*, 937 F.2d at 1426. And, in *United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002), the issue was not timely disclosure but rather an alleged divergence between the disclosure that had been timely made and what the expert actually testified to at trial. *Id.* at 1018. Moreover, in *Finley*, the expert witness presented the only evidence of Finley's diagnosed mental disorder, and the district court's exclusion of the entirety of the expert testimony—not just the arguably undisclosed part—left Finley unable to present his main defense. *Id.* Even assuming the expert testimony excluded in this case was relevant to and supportive of Moreno's self-defense theory, it was not essential to that theory to anywhere near the extent the expert testimony in *Finley* was.

disclosed as a witness on time, we held that he could still testify. *Id.* at 659–60. We did reason that "the government could not then have intended to call" the cooperator when the district court's disclosure deadline came and went. *Id.* at 659. But that was because the cooperator "had an absolute privilege not to testify," leaving the government powerless to disclose him as a witness it intended to call at trial. *Id.* (citing U.S. Const. amend. V). Expert witnesses, in contrast, have no such privilege and, relatedly, are not normally being prosecuted in the very criminal case for which they would be called to testify. Moreno thus had full control over his intent to call an expert witness. Because he did not come close to meeting the district court's reasonable disclosure deadline, Moreno was properly left to proceed without his desired expert testimony.

## III.

For the foregoing reasons, we reverse Moreno's convictions for attempted robbery and remand for a new trial on those charges. We affirm Moreno's remaining convictions.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

THOMAS, Chief Judge, concurring in Parts I, II(A)(1) and (2), and II(B) and (C); and dissenting from Part II(A)(3).

When the defendant requests a specific jury instruction, but fails to object when the district court instructs the jury differently, we may only review for plain error. *Jones v. United States*, 527 U.S. 373, 388 (1999). Although Moreno initially requested that the district court instruct the jury that,

with respect to the two attempted robbery charges under 18 U.S.C. § 2112, the Government must prove he acted with the specific "intent to steal," Moreno failed to object to the instructions he now challenges in the district court. As such, our review is a limited review for plain error. *Id.*; *see also* Fed. R. Crim. P. 52(b). Under this difficult standard, Moreno fails to demonstrate that any instructional error was not harmless in light of his post-arrest admissions. Accordingly, I respectfully dissent from the majority's reversal of Moreno's two attempted robbery convictions. The failure to preserve a claim ordinarily prevents a party from raising it on appeal, but Rule 52(b) "recognizes a limited exception to that preclusion" for plain errors. *Puckett v. United States*, 556 U.S. 129, 135 (2009). "[T]he authority created by Rule 52(b) is circumscribed." *United States v. Olano*, 507 U.S. 725, 732 (1993). Plain error review under Rule 52(b) involves a four-pronged process, and "[m]eeting all four prongs is difficult." *Puckett*, 556 U.S. at 135. First, "there must be an error or defect . . . that has not been intentionally relinquished or abandoned." *Id.* "Second, the legal error must be clear or obvious." *Id.* "Third, the error must have affected the appellant's substantial rights." *Id.* To affect the appellant's substantial rights, the appellant must demonstrate the error "'affected the outcome of the district court proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 734). And finally, even if the appellant establishes the first three prongs, our discretion to remedy the error "ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 736). As such, Rule 52(b) "leaves the decision to correct the forfeited error within the sound discretion" of this Court, *Olano*, 507 U.S. at 732–34, and the discretion conferred on us by Rule 52(b) should be exercised only where a "'miscarriage of justice would otherwise result,'" *United*

*States v. Young*, 470 U.S. 1, 15 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)).

Even if there were plain instructional error as to the robbery counts, I respectfully disagree that it affected Moreno's substantial rights and seriously undermined the fairness and integrity of the proceedings.  Any instructional error was harmless in light of the record evidence.  The evidence introduced at trial, in conjunction with Moreno's post-arrest statements, demonstrates that he possessed the specific intent to permanently deprive the officer of both the gun and the vehicle, and the failure to instruct the jury regarding that intent did not affect the outcome of the district court proceedings.  With respect to the officer's gun, Moreno admitted that at the time he attempted to disarm the officer, he intended to gain possession of the gun and take the gun so that the officer could not use it against him.  Although Moreno claimed that he went after the gun to avoid being shot, Moreno further admitted that he intended to take the gun from the officer, and throw it out somewhere in the desert so that the officer could not use the gun against him, effectively depriving the officer of the gun. Specifically, Moreno admitted that in going after the officer's gun, he "wanted to take the gun from [the officer]," and once he gained possession of the gun, he intended to "throw it out into the desert" so that he would not be shot by the officer. The logical implication of Moreno's admission is that in order to avoid being shot, Moreno intended to permanently deprive the officer, and the government, of the gun by taking it and throwing it out in the desert in such a way that the officer would not able to recover it.  Moreno's admissions evidence more than an intent to momentarily take the gun from the officer.  In fact, Moreno's claimed motive to avoid being shot, when viewed in conjunction with his admitted intent to take the gun and throw it in the desert, establish that

he possessed the requisite intent to permanently deprive the officer, and the government, of the gun. The failure to instruct the jury on that element therefore did not have an impact on the ultimate conviction because Moreno freely admitted that he possessed the requisite intent. As such, Moreno failed to establish plain error.

With respect to the officer's vehicle, Moreno's admissions, when coupled with his actions, once again establish the requisite intent to sustain the attempted robbery conviction. In the post-arrest interview, Moreno admitted that his overall intent in getting in the officer's vehicle was to use the vehicle in his escape. Specifically, at the time he got inside the officer's vehicle, and just before he put the vehicle in gear, Moreno admitted he intended to "tak[e] off" in the vehicle in order to "get to the border." Further, following the sheriff's paraphrase of his statement, Moreno agreed that when he initially got in the vehicle, "his original intentions" were to "take off" and "just keep going." Moreno clarified, he "was going to go all the way to the border," and that he "was going to take the car and go in it all the way to the border." Although ultimately, once he arrived at the border, Moreno intended to "jump and flee to [Mexico]" and necessarily "leave the truck at the port of entry," Moreno's admissions establish that at the time he attempted to drive off in the officer's vehicle, he had formed the requisite intent to permanently deprive the officer, and the government, of it.

Further, the fact that the overall incident took place near the border does not negate Moreno's admitted intent to deprive the officer and the government of the vehicle. Moreno stated that when he got into the driver's seat of the officer's vehicle, he intended to flee, and that he was "just [going to] keep going." Although Moreno stated that if he

had been able to drive off in the vehicle, he would have left the vehicle at the port of entry, that does not negate his original admitted intent to take off in the vehicle, to just "keep going," and to deprive the officer of the use of the vehicle in such a way that the officer would not be able to recover the vehicle or use it to apprehend Moreno. Even though the overall incident took place near the border, the record does not indicate that Moreno intended to relinquish the vehicle at the border, or that he intended for the government to regain possession of the vehicle. Aside from the proximity to the border, there is no indication that Moreno intended for his taking of the vehicle to be only temporary, or for the government to regain possession of the vehicle.

Because the evidence was sufficient to establish the requisite intent, any instructional error was harmless, and certainly did not constitute plain error as to the robbery counts. I join the majority in all other respects.

For these reasons, I respectfully dissent, in part.

---

ZILLY, District Judge, dissenting from Part II(C):

In the criminal context, courts have upheld the "drastic remedy" of excluding a witness only in cases involving "willful and blatant" discovery violations. *Taylor v. Illinois*, 484 U.S. 400, 416 (1988); *United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir. 1991). In this case, the district court made no finding that Moreno engaged in willful and blatant conduct. Rather, in the district court's own words, Moreno's expert witness was excluded "based on lack of timeliness and failure to follow the Court's order." The district court's exclusion of Moreno's expert witness (Weaver Barkman),

without any finding of willful or blatant conduct, violated Moreno's fundamental right to due process. This exclusion of the expert witness requires reversal and a new trial on all appealed counts. *United States v. Finley*, 301 F.3d 1000, 1018 (9th Cir. 2002).

The Supreme Court has recognized that the right to present evidence in one's own defense is a fundamental constitutional right. *Rock v. Arkansas*, 483 U.S. 44, 52 (1987). The Supreme Court considered the intersection of this right and discovery sanctions in *Taylor*, and held that "few rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor*, 484 U.S. at 408. *Taylor* holds that exclusion is possible ***only*** if the violation was "willful and blatant." *Id.* at 416–17.

The majority wrongfully attempts to avoid this well-established law by reasoning that Barkman's exclusion "was no sanction," but rather simply enforcement of an earlier pretrial order. The district court, however, imposed a "sanction," plain and simple. A discovery sanction is defined as: "[a] penalty levied by a court against a party or attorney who … inexcusably fails to comply with … the court's discovery orders." Black's Law Dictionary 1542 (10th ed. 2014). Numerous Ninth Circuit opinions have characterized the exclusion of a witness for violating a discovery or scheduling order as a "sanction." *See United States v. Verduzco*, 373 F.3d 1022, 1033–35 (9th Cir. 2004) (observing that, if the discovery violation at issue had been the sole ground for excluding the defense expert, a Ph.D. sociologist, the district court would have abused its discretion in imposing such sanction, but affirming on the basis of the district court's additional Rule 403 analysis); *United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir. 1991) (holding that, with respect to a forensic pathologist proffered

as an expert by the defendant in an allegedly untimely manner, "no willful and blatant discovery violations occurred" and "application of the exclusionary sanction is impermissible"); *see also Finley*, 301 F.3d at 1016–18 (9th Cir. 2002) (reversing the exclusion of the defendant's expert witness, a licensed clinical psychologist, reasoning that, even if a discovery violation occurred, the "severe sanction of total exclusion of the testimony was disproportionate to the alleged harm suffered by the government.").[1]

The majority nevertheless asserts that Moreno "mischaracterizes the enforcement order as an exclusionary 'sanction'" relying on *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) (en banc). *W.R. Grace*, however, does not support the majority, but rather Moreno's right to a new trial. In *W.R. Grace*, the district court had excluded undisclosed witnesses from the government's case-in-chief.[2] Ironically, in *W.R. Grace*, the government, rather than the defendant, argued that the exclusion of witnesses can be imposed as a sanction only when the district court finds that the violation was "willful and motivated by a desire to obtain a tactical advantage." *Id.* at 514–15 (quoting *Finley*, 301 F.3d at 1018). Because the district court in *W.R. Grace* made no such finding, the government contended the exclusion order could not stand. *W.R. Grace* rejected the

---

[1] The majority's attempt to distinguish these cases is unconvincing. Each decision stands for the proposition that the exclusion of a witness on the basis of a discovery or scheduling order violation constitutes a sanction. The majority does not suggest otherwise.

[2] In *W.R. Grace*, the district court did not exclude any witnesses, but rather precluded the government from identifying additional witnesses after the deadline. Thus, *W.R. Grace* involved only the enforcement of a scheduling order, as opposed to sanctions for a discovery violation.

government's argument, which relied on *Finley*, observing that "*Finley*, . . . like *Taylor*, involved a ***defendant's*** right to present evidence, not the government's, and has no bearing here." *Id.* at 515 (emphasis added). *W.R. Grace* explicitly recognized that the government and a criminal defendant are subject to different standards,[3] and its ruling, which was unfavorable to the government, had no effect on the doctrines applicable to the exclusion of criminal defense witnesses.

The majority's conclusion that Moreno was "properly left to proceed without his desired expert testimony" completely ignores Supreme Court jurisprudence. Even if Moreno violated the applicable scheduling order, the district court improperly precluded the defense expert without making the requisite finding of willful or blatant conduct. As a result, the district court never reached the merits of the government's evidentiary objections or conducted a *Daubert* hearing. Any skepticism about the proffered evidence that stems from an undeveloped record is not within the province of an appellate court to consider.

I would reverse Moreno's convictions on all counts, except for the unappealed illegal re-entry count, because his defense expert was excluded in violation of his constitutional rights, and I therefore respectfully dissent. I concur, however, in the result reached in Part II(A) of the majority opinion, reversing Moreno's convictions for attempted robbery of the gun and the truck based on instructional error.

---

[3] The majority's suggestion that *Verduzco*, *Peters*, and *Finley* do not contradict *W.R. Grace* is analytically flawed because (i) all three cases **predate** *W.R. Grace*, and (ii) all three cases involve a **criminal defendant's** right to call witnesses, which was not even at issue in *W.R. Grace*.